Argued and submitted December 12, 2005, reversed and remanded for
entry of judgment granting legal and physical custody of child to father and
for development of plan giving mother reasonable parenting time October 18, 2006

## Richard J. DeWOLFE,
*Appellant,*

*v.*

## Kelly Marie MILLER,
*Respondent.*

## DR99-01-540; A125560

145 P3d 338

Philip F. Schuster, II, argued the cause for appellant. With him on the briefs was Dierking & Schuster.

Camaron R. Vallepalli argued the cause for respondent. With her on the brief was Johnson Renshaw & Lechman-Su PC.

Before Landau, Presiding Judge, and Ortega, Judge, and Breithaupt, Judge pro tempore.

ORTEGA, J.

## ORTEGA, J.

Father appeals from the trial court's judgment denying his motion for a change in custody of the parties' then-five-year-old son. We review *de novo*, ORS 19.415(3), and conclude that the significant current harm and risk of increased harm to child arising from mother's newly diagnosed personality disorder constitute a substantial change in circumstances concerning mother's capacity to parent child. Accordingly, we reverse and remand for entry of a judgment granting custody of child to father and for development of a plan giving mother reasonable parenting time.

We begin our examination of the evidence with a brief overview of the relationship between the parties and the initial determination of custody. Father and mother had an on-again, off-again relationship that ended shortly before child was born in August 1998. Child is father's only offspring; mother has another son, T, from a previous relationship, who is approximately 10 years older than child. Father and mother never married, but they lived together for approximately six months. Their relationship, which lasted for five or six years, was interrupted by an interval of about a year during which they broke up and mother was briefly married to someone else. Father and mother finally broke up while mother was pregnant with child.

When child was born, mother at first did not inform father of the birth, but he learned of it from a friend. Although mother allowed father to see child at her house a couple of times for about half an hour, she refused father's requests to see child more frequently. Then, when he made it clear that he was not going to reunite with mother, she refused to let father see child at all. After father continued to push the issue of visitation and filed a petition for parenting time, mother insisted that father take parenting classes before visiting child and that his first four visits be supervised. In September 1999, the parties signed a stipulation, and five months later a stipulated judgment was entered that established father's paternity, awarded sole custody to mother, required father to pay child support, and awarded father parenting time. Under the parenting plan, father had

parenting time every other weekend and, starting when child turned five, for three weeks during the summer.

Although mother had agreed to be flexible regarding visitation at the time of the stipulated judgment, that was not father's experience (as will be discussed further below). When he approached her about increasing his parenting time, she likewise refused to consider such a change, so he sought increased parenting time from the court when child was five years old. The parties agreed to submit to a custody evaluation by Ross-Bakker and, after that court-ordered evaluation, father amended his motion to request custody of child. Because Ross-Bakker's evaluation plays an important role in our analysis, we examine it in detail, and we also examine the events described by various witnesses as those events are related to the custody and psychological evaluations.

At the time of the hearing, Ross-Bakker had been performing custody evaluations for about six years. She has an undergraduate degree in psychology and a master's degree in social work, and she is an experienced family therapist and mental health examiner. Ross-Bakker first met with each parent individually in her office and then met with each parent and child together; she then did a home visit with child and each parent. In addition, she had another hour-long office visit with mother and child. Ross-Bakker spent about 35 hours on the custody evaluation, although normally such evaluations take 20 to 30 hours.

After her first visit with mother, Ross-Bakker "had an immediate response that there's something going on here[;] there's something not making sense." Ross-Bakker observed that mother experienced rapid mood changes and that child likewise demonstrated both "behavior and mood changes," depending on which parent he was with. Ross-Bakker became convinced that psychological evaluations were needed and communicated that concern to parents' respective attorneys.

On the suggestion of mother's attorney, Davis was selected to conduct a psychological assessment of each parent. Davis is a therapist and licensed psychologist. He has a doctorate in clinical psychology and has written or

coauthored about 25 publications. So as not to interfere with the objectivity of his assessment, Ross-Bakker did not provide Davis with any information before he performed the psychological evaluations. Davis concluded that father showed "no evidence of a personality dysfunction and belongs to a group of individuals who are essentially well-functioning, having no major personality disturbances." On the other hand, Davis diagnosed mother with "Histrionic Personality Disorder, severe, with Narcissistic Passive-aggressive and Obsessive-compulsive features."

Ross-Bakker thought that Davis's assessment addressed the problems that had concerned her. She explained that personality disorders such as mother's are chronic conditions, not easily changed. Although mother likely has some ability to change, it was Ross-Bakker's observation that mother is unwilling to do so. Indeed, mother is not even aware of the need to change, despite attempts to explain it to her; she steadfastly and unrealistically refused to admit any faults. Davis likewise noted that mother was exceptionally resistant to answering questions during her psychological evaluation; out of "hundreds of people" to whom he had given a particular questionnaire, mother was perhaps the second to decline to answer so many questions. Ultimately, in Davis's view, mother "wants to do the right thing" but does not understand her effect on child.

After observing child with both parents and interviewing people identified by each parent as sources of additional information, Ross-Bakker completed her assessment, concluding that father should be awarded custody. She recognized that a custody change during a child's primary years is an unusual, even "extreme" recommendation, but concluded that the change was necessary because the harm that child was beginning to experience in mother's care put him at risk for developing a personality disorder himself. We summarize Ross-Bakker's analysis, along with testimony regarding the events reported to her, in some detail.

To begin with, Ross-Bakker developed a strong impression that child does not feel able to be himself in mother's presence, instead becoming "stiff" and "very, very correct." He presented with "shoulders tight, face straight,

very stiff body, smaller voice." While playing a game with mother, child "was so quiet and serious" that one of Ross-Bakker's coworkers thought that child was seven, rather than his actual age of five. Ross-Bakker concluded that child does not feel emotionally safe enough to be himself around mother.

During the same office visit, Ross-Bakker observed that mother addressed child with a "friendly formalness" rather than "an affectionate warmth that you would expect from a parent." During the evaluation process, Ross-Bakker never observed "any actual affection from mother to * * * child."[1] She thought that mother's appearance of formality was an indication of her personality disorder rather than mere nervousness.

In contrast, Ross-Bakker observed that child was noticeably more comfortable with father than with mother. For example, she noted that child giggled and played normally while at father's home, but did not smile when in mother's home. When child showed Ross-Bakker his room at father's house, he expressed himself more, rummaging around to find his favorite toy to show her; at mother's house, he had to be prompted to show anything. Consistently with those observations, child's paternal grandfather and uncle and one of father's friends reported their observation that child appeared to relax and become more himself when he was at father's home. Father also testified that child's demeanor appears "stiff" and "real rigid" when father picks him up at mother's house, but that child becomes happy and bouncy when he is at father's house.

Ross-Bakker had never seen another child show such significant differences in behavior and, more significantly, personality structure depending on which parent was present. She explained,

> "[I]n behavior I might have seen a marked difference in, you know, temper tantrums versus quietness in one child, but not in their personality structure, and that's what made me

---

[1] Although mother offered testimony from some childcare providers and a coworker that she had an affectionate relationship with child, none of those witnesses appeared to have spent time carefully observing mother and child together.

most concerned. I did one on a child who was much more willing to have a temper fit with mother than father; that's not what I'm talking about. I'm talking about in his personality."

The changes that she observed in child's behavior and mood were "the heart of [her] concern."

Ross-Bakker testified that she did not think it appropriate to ask a five-year-old whether he had a preference about which parent to live with; however, the behavior that she observed indicated that child was more comfortable with and felt safer and happier in father's home. For example, child displayed more togetherness with father, using the word "we" often. Ross-Bakker testified, "In spite of what we would normally think at this age, that he would be more bonded with his mother since she's been the primary caregiver, I did not see a particularly strong bond there, and I did see * * * clearly a stronger bond with his father." Ross-Bakker specifically considered and ruled out the possibility that child's reaction was based on his different activities at each parent's home.

Ross-Bakker thought that mother's present inability to meet child's needs was a fairly new development. She observed that mother is "particularly good" at meeting the needs of very young children, who primarily need things such as food and clothing and sleep. However, Ross-Baker opined that, as child grows older and his needs become more focused on personality development, mother's ability to meet child's needs has decreased. She noted that, at the time of the initial custody determination, when child was a year old, child's basic needs were simpler—being fed, having his diapers changed, and so on; by age five, however, child needed to learn to succeed in school and social settings. The risk to child from mother's personality disorder grows greater as child's emotional needs become more complex. As Ross-Bakker explained, "[t]he risks are choosing the wrong family, the wrong group, the wrong social network to be with, gangs or just dysfunctional kids, drugs, alcohol, sex, acting out, [running] away. All of those things are choices that children make because they can't just be who they are at home."

Discussing mother's diagnosis, Ross-Bakker explained that "[t]he most critical thing about personality disorders is that they show themselves in relationships to others." Ross-Bakker also explained that people with histrionic personality disorder tend to take in information and

"twist[ ] it into a story that feels real to them, but it's not really real, and so they put it back out there. That's extremely scary for a child to have to always assess whether or not they're on the same page as their parent or whether or not this is really happening or that's really happening. It makes his ability to judge reality and who he is and how he fits into the world much more difficult."

She explained that the histrionic personality disorder manifests, in part, in the way that mother's demeanor frequently is not congruent with what she was talking about. For example, "[s]he would say something very drastic, and then come back with something very light-hearted and funny right afterwards. That is not a normal pattern of communication." Ross-Bakker stated that mother's emotional response during the custody evaluation was consistent with her behavior in court: at the hearing, while Ross-Bakker was being examined about the evaluation, mother was laughing and making faces.

A significant example of mother's abnormal communication and her lack of awareness of its effect on child occurred during a visit to Ross-Bakker's office, during which mother made, in child's presence, serious but questionable accusations about father. Mother began by expressing dissatisfaction with father's handling of an incident in which child fell and sustained some minor scratches.[2] When Ross-Bakker

---

[2] Mother reported to Ross-Bakker that child had scratches on his eyes after returning from a weekend with father. Mother used "serious words" to describe the scratches. When mother reported that father had failed to explain how the injury happened, child interjected that he (child) had already told her that he fell. Mother then acknowledged that child had said something about that.

At the hearing, mother maintained that father had refused to answer her questions about the scratches and that she had taken child to the hospital. Mother acknowledged that child had told her that he was injured when he fell, but she was upset that she had not been provided with "an exact date and time, how it happened[.]" One of mother's neighbors testified that she bumped into mother and child at the urgent care clinic and that child's eyelids looked mildly swollen, with some pus. However, the doctor's report indicated that the scratches were not oozing and were mere abrasions.

observed that child was visibly upset and suggested that the topic of the scratches not be discussed in child's presence, mother dismissed that suggestion, saying that child was "fine."

Then, with child still present, mother went on to accuse father of having had inappropriate sexual contact years earlier with mother's older son, T. At that point, Ross-Bakker stopped mother from further discussion of the topic in child's presence. When mother left the room, child's demeanor changed dramatically, and he became more relaxed and playful.

At the hearing, mother reiterated her accusations of two incidents of sexual impropriety, one in which she allegedly discovered father and T in the shower together and one in which she allegedly discovered them in bed together watching TV. Neither Ross-Bakker nor the trial judge found mother's allegations to be credible, and neither do we. While describing the incidents with sexual overtones that would be cause for alarm, mother denied thinking that the incidents were sexual in nature and quibbled about details instead of addressing the central issue. For example, while testifying about the shower incident, mother questioned the accuracy of Davis's notes; she denied saying that father "had his hand on [T's] butt" and claimed instead to have said that father's hand "was on the side, not directly on the butt." She also insisted that, while the incident concerned her, she did not intend to raise it as an issue and did not believe it to be sexual in nature. Mother's testimony about the bed incident was similar:

"[Father's attorney]: You also told [Ross-Bakker] that [T's] hand was near—and I quote—[father's] dick. That's exactly what you told her, isn't it?

"[Mother]: I said [father's] hand was—or [T's] hand was right next to it. I said his hand was on his thigh.

"[Father's attorney]: And you didn't believe that that suggested a sexual intention on [father's] part toward your son?

"[Mother]: Well, when I flung the comforter off, it startled [T], and you know, he jumped.

"[Father's attorney]: So let me get this straight. They're in the dark, the door comes open, and you take off the comforter, and * * * [T's] hand is near [father's] penis, and you don't think that's a sexual act?

"[Mother]: The T.V. was on. You forgot to say the T.V. There was light.

"[Father's attorney]: Weren't those incidents serious in your opinion?

"[Mother]: I didn't see anything that was inappropriate on touching. I just felt it was inappropriate for [father] to be [lying] in bed nude with [T] next to him."

Father denies that those incidents or any other inappropriate contact with T occurred and testified that mother never spoke with him directly about the alleged incidents. Father added that, if mother really did believe that he had engaged in sexual contact with T but failed to report it because she was concerned that father might lose his job (as father had heard her reasoning explained), he questioned her ability to keep child safe.

Ross-Bakker felt that mother's complaints about father's conduct seemed rehearsed. She explained:

"There was a very peculiar way in which her stories came out, like she had thought of this phrase that she was going to use, or that the words were oftentimes bigger than what she—what was really appropriate to be using, or that it was a planned speech almost. Over and over again in that one instance in the office she said the words, 'I'm not making any accusations,' but then she'd turn right around and make an accusation, and then some of the accusations that she made were so unusual * * *."

Ross-Bakker found it curious that mother did not report the accusation of sexual impropriety in their initial meeting but instead waited and requested another meeting—her third meeting with Ross-Bakker—to report it. In her experience, parents confronted with sexually inappropriate behavior toward children do not avoid reporting the behavior in order to protect the offender's career. Indeed, she thought that, if mother had believed that the incidents that she described had actually occurred, mother would have reported the incidents and taken action at the time. Ross-Bakker did not

believe that mother's report was credible enough to trigger her own statutory duty to report child abuse.

Mother's inconsistencies in relating her accusations appear to be part of a larger communication pattern that is likely to be very confusing to a child. Both Davis and Ross-Bakker believed that mother's answers to questions were generally inconsistent. For example, mother initially told Davis that she had no reason to object to the visitation schedule, but later stated multiple objections. Ross-Bakker likewise found mother's presentation to be inconsistent and thought that her statements did not add up.

Other aspects of mother's personality disorder likewise present difficulties for raising a growing child, even while in some instances helping mother to focus on a more limited set of child's needs. For example, Ross-Bakker explained that the obsessive-compulsive aspects of mother's personality might contribute to success in the workplace by making her very detail-oriented and hard-working and might help mother to focus on child's education, but that those aspects also compromise her ability to meet or to recognize his emotional needs. Ross-Bakker noted that it was "very difficult to be raised by someone who's obsessive-compulsive," because mother insists on a level of precision and control that compromises child's ability to have a normal childhood.

Ross-Bakker also described the effects of the narcissistic and passive-aggressive features of mother's personality disorder. Narcissism is associated with a lack of empathy, a need for excessive admiration, and interpersonal exploitation. As for passive-aggression, "if someone's asking for more from you, then the passive-aggressive [response] would be to not perform but find all kinds of other [excuses for] your lack of performance * * *." Ross-Bakker described the passive-aggressive and narcissistic features as contributing to mother's portrayal of herself as a victim in her relationships with others, including her family and her ex-boyfriends, and to mother's being "sullen and argumentative." Mother's sense of victimization and her tendency to blame others keeps her from learning from past mistakes and building stronger relationships.

Mother consistently presented herself as a victim, displaying "an attitude that 'I'm the one that is being damaged here.'" Mother represented to Ross-Bakker that she "has been either victimized or cut off from every—almost every strong male or any male figure in her life as far as even the parents of her boys." Mother's apparently attendant conclusion is that "her boys [do] not need the men in their lives." Ross-Bakker opined that mother does not understand child's need for a relationship with father and that mother's lack of awareness is related to her clinical diagnosis—that is, her sense of being victimized blinds her to child's own needs for connection with father.

Similarly, Davis noted that mother has a "gender bias" that results from "difficulty in relationships with men in her life[.]" He testified that mother does not pose a "physical danger" to child, but that she poses a "danger of damage to a male child's self[-]understanding, self[-]appraisal, his ability to size himself up as a male person * * *." Based on mother's clinical evaluation alone (not having been asked to evaluate child or even having met child), Davis estimated that "there's a good fifty percent chance" that child will feel unable to safely express himself, and that such psychological problems will hinder child's success in school and later life. Ross-Bakker testified that she "agree[d] completely" with Davis's assessment of mother's gender bias.

Mother also is socially isolated and lacks strong relationships. When Ross-Bakker asked her for references, mother listed only one person who was not a family member or childcare provider, and that person did not appear to be in frequent contact with mother and child together. Although Ross-Bakker acknowledged that it is desirable to avoid dysfunctional family relationships, she added that people who do so usually create strong bonds with a group of friends to take the place of family; mother, however, does not appear to have created such strong relationships. Ross-Bakker noted that, when mother described her experiences, she frequently "talked about all the different people in her life that she no longer sees, for whatever reason."

Mother's isolation likewise is linked to her personality disorder. Ross-Bakker explained that when mother begins a new relationship,

"that relationship is going to be her focus as long as she's the center of attention and can feel as if she's getting what she needs out of that. As soon as—and this is her history— as soon as that doesn't put her into the center of attention, then she moves on from that relationship[.]"

Mother's isolation from people with whom she has had relationships also causes child to become isolated from people who have been important to him.[3] Mother has pulled child and his older brother T away from people with whom the children have bonded, and the children have few relationships with other people in mother's life. Yet Ross-Bakker observed that mother does not view herself as having any problems with relationships and is not aware of ways that her conduct affects others, including child.

Consistently with that evaluation, mother apparently has isolated T from his father. Mother told father inconsistent stories about T's father: that she had left him because he was abusive and drank too much, that he was a fireman, that he was a "deadbeat," and that he was dead. Although mother indicated that T's father simply was not interested in seeing T, father testified that T's father had tried to make contact with T, but mother kept him away by threatening to sue for back child support.

In the years that father and mother were together, father and T developed a strong bond, and father stayed in the relationship with mother partly for T's sake. After father and mother broke up, however, she refused father's requests to see T. Although mother attributes that lack of contact to T's own wishes, T's demeanor and body language suggested that his assertions that he did not want to see father reflected mother's view rather than his own feelings. T told father that he was not supposed to talk with him, although they occasionally talked when father was picking up or dropping off child. If T lingered at all to talk, mother honked her horn or ordered T to get in the car. Father also described an incident when he had given T a gift; T registered delight at the gift and immediately started playing with it. However, when father was dropping off child a few days later, mother told

---

[3] Ross-Bakker observed that father maintains longstanding relationships.

father that T had something to say to him. T, with mother looking on, then returned the gift, saying that he could not accept it because father had been "mean" to mother.

Mother also has consistently attempted to hinder father's efforts to develop a relationship with child. Ross-Bakker's conclusion after performing her assessment was that mother had initially tried to keep father from having any relationship with child and then allowed father only the amount of time specified in the original stipulated judgment, without flexibility. Although mother claimed that father had little interest in child, Ross-Bakker found father's account of events more credible in light of reports that she received from other sources and in light of "mother's demeanor and attitude about father."

At the time that father first went to court to pursue parenting time, he had not had an opportunity to form a bond with child, who was still very young. Based on his observations of mother with T, father did not have a good impression of mother's parenting skills at the time of the initial custody determination, but did not see cause for serious alarm at that time. Father's concerns developed over time, as a result of mother's inflexibility and refusal to work with him regarding child's schedule and his observations of T's experiences.[4]

Although the parties agreed at the time of the stipulated judgment to exercise some flexibility regarding parenting time, such flexibility did not occur in practice. For example, although the stipulated judgment allowed father to talk with child on the phone, he was unable to do so because mother screened his calls. Mother refused efforts of father and his father to take child to visit his great-grandmother, who was having serious health problems. Although mother initially allowed father's parents and brother some time with child, father testified that such allowances decreased over the years and that mother no longer would even talk to his

---

[4] Father recognized that mother, not he, had authority to make decisions regarding T. However, Ross-Bakker talked with T as part of her evaluation and observed that he was now "shut down" and did not appear to be well adjusted, based on her own observations and "information that I have about who he used to be and who he is * * *[.]" Her report includes father's statement that T formerly appeared to be outgoing and happy.

parents. During the year before the hearing, she stopped allowing father's family to see child during her custodial time. Mother, for her part, attributes her decreased willingness to allow child to spend time with father's family to scheduling difficulties and their failures to make arrangements in advance.

Ross-Bakker observed that father sought additional parenting time from the court only when his attempts to reach agreement with mother failed. According to father, mother has been unwilling even to talk with him about child's schedule or to allow additional parenting time, except when it suits her own needs. Father described one incident in which mother asked him to care for child on a weekend when mother had plans and then tried to deny him his scheduled parenting time the following weekend. Father described another incident in which he asked if he could have more time and mother said that he could, "for more money[.]"[5] He also described an incident when he and mother changed father's weekend parenting days because of father's work schedule; according to father, mother then arrived early to pick up child and, when father pointed out that they had agreed to change days, mother insisted on enforcement of the time specified in the stipulated judgment, even resorting to calling police officers to father's house.

Mother likewise has excluded father from decisions regarding child, regardless of child's interests. For example, on child's school emergency contact information form, mother listed only herself and her grandmother, who is in her eighties, lives 10 or 15 miles from the school, and does not drive. Father also testified that child was very interested in playing soccer, but when father tried to speak with mother in person about signing child up for a team, mother turned up the radio and refused to listen, and later would not return his calls.

Mother also unreasonably tried to prevent and then interfered with father's efforts to volunteer at child's school. When father first began volunteering, mother told the principal (incorrectly) that the stipulated custody judgment did not allow father to see child at school. When the principal

---

[5] Father has consistently made his child support payments.

reviewed the judgment and found nothing prohibiting father from volunteering, mother insisted that she did not want to be there at the same time as father, so father agreed to volunteer only on Mondays, his day off. After father had been volunteering for several months, mother informed him and the school that she intended to begin volunteering on Mondays. Although father works a Tuesday through Saturday night shift, he changed his volunteering schedule to Tuesdays to accommodate mother. However, child's teacher later told father that mother did not actually show up on Mondays, despite the change that father had made to accommodate her. Despite excuses, mother acknowledged at trial that she had attended only two of the first eight Mondays that she had agreed to volunteer.

Ultimately, Ross-Bakker was persuaded of the need for a change in custody by the abundant evidence that mother's personality disorder now interferes significantly with her ability to recognize and address child's needs. As Ross-Bakker explained, "[N]o child can accomplish any task if they have the earlier task unmet or if they have so many other psychological things that are bearing on them where they don't have the freedom to get to their task." Mother's personality disorder drives her to place her own personality first and, consequently, places child in danger of having his personality "subsumed" by mother's: "She needs him to be exactly what she needs him to be, so when he gets older and older and starts developing his own sense of self, he's going to become more and more of a challenge for her, and it's going to be harder for him." Ross-Bakker believed that the subsuming effect was "on its way" and that the risks to child increase as child ages.

Ross-Bakker recommended that father be awarded sole legal custody and primary physical custody and that mother be awarded parenting time. Despite the seriousness of such a change, Ross-Bakker testified that she was "very convinced[;] it's not a close case":

"I feel like there is actual emotional harm happening and high, high risk of emotional harm coming to this child that makes it weigh in the balance, and this is a very big thing as far as I'm concerned, too, changing custody of a child. I

wouldn't recommend it lightly. I've recommended it here for these reasons. He has a very stable home with father. He seems to have the stronger * * * relationship with father. He seems to be more relaxed and at ease and himself, a happy-go-lucky, bright, cheerful five-year-old child when he's in his father's presence. He has—seems to have more family and more relationships in father's home."

She also opined that father is more able to support mother's relationship with child than mother is able to support father's.

Although Davis did not ever meet child and was not engaged to perform a custody evaluation, he opined that child should remain with mother. His opinion was based on the view that, despite mother's personality disorder and "a good fifty percent chance" that mother would damage child's sense of self, pre-adolescent children generally have a crucial need for their mothers. He projected that, when child reached the age of 11 or 12, he would have a more urgent need for father. He suggested that, with help, mother might "be able to overcome some—not much, but enough of her difficulty and achieve some guidance" with raising child.

It appears that the trial court found father to be more credible than mother in the areas where the parties' testimony conflicted. The court observed that mother has not facilitated father's involvement in child's school, and identified concerns about mother's ability to separate her own interests from child's interests and about negative comments she made about father in child's presence. And the court apparently disbelieved mother's allegations that father had engaged in sexual conduct with T, commenting that father has consistently been "a good and committed parent." The court also appears to have found the testimony of both Ross-Bakker and Davis to be persuasive, noting that they were "very competent."

However, the court concluded that mother's personality disorder was not a new circumstance and that child's progression to a different developmental stage was not an unanticipated change that would support a custody modification. The court commented that the psychological evaluation did not "suggest any change in * * * mother's ability to

function as a parent since the time of the original decree." Accordingly, the trial court denied father's motion to change custody but awarded him substantially increased parenting time.

■ On appeal, father renews his argument that he should be awarded custody of child. At oral argument, father compared the case to a situation in which an alcoholic parent's condition does not change but the child grows older and begins emulating the parent's drinking; in such a case, there is a substantial, unanticipated change. Mother, for her part, concedes that emotional harm to a child may constitute a change in circumstances but argues that no such harm was proved in this case. She further contends that, if she has a personality disorder now, then she must also have had one at the time of the earlier custody decision, and so the disorder cannot be a changed circumstance.

There is no indication in the record that, at the time of the initial custody determination, the court considered the effect that mother's personality disorder (which was undiagnosed at that time) would have on child's development at this age. Nor is there any indication that father knew relevant facts at that time and waited to litigate the issue until this later proceeding. Hence, the earlier custody determination does not preclude us from considering whether mother's personality disorder currently affects her ability to parent child. We conclude that, because mother's personality disorder undermines her ability to parent child at this new stage in his development, there has been a substantial change of circumstances concerning mother's ability to care for child and that child's best interests require a modification of custody to father.

■ The long-established rule is that a party seeking modification of custody must "show a change of circumstances arising subsequent to the making of the last order respecting custody" and that changing custody would benefit the child. *Henrickson v. Henrickson*, 225 Or 398, 402, 403, 358 P2d 507 (1961). The "change of circumstances" requirement is satisfied "[i]f circumstances relating to the capability of one or both parents to care for their child have changed since the previous custody arrangement[.]" *State ex rel*

*Johnson v. Bail*, 325 Or 392, 394, 938 P2d 209 (1997). The court considers the best interests of the child only if a change of circumstances is established. *Id.* at 397.

■     The change in circumstances rule is meant to avoid repeated litigation and promote stability for the child. *Id.* at 398; *Ortiz and Ortiz*, 310 Or 644, 649, 801 P2d 767 (1990). Unless the parent seeking a custody modification "establishes that the facts that formed the basis for the prior custody determination have changed materially by the time of the modification hearing, the prior adjudication is preclusive with respect to the issue of the best interests of the child under the extant facts." *Johnson*, 325 Or at 398. That preclusive effect means that a parent seeking a change in custody cannot rely, to establish a change in circumstances, on evidence that was or could have been introduced in the earlier custody proceeding. For example, a mother

> "could not obtain a change in custody solely upon the basis of evidence of the father's conduct as shown in the transcript of the original proceeding or additional evidence which could have been introduced in the first proceeding but was not. In either instance, the decision in the prior proceeding would be *res judicata* in a subsequent modification proceeding, assuming that there was no evidence of a change in circumstances after the original decree."

*Greisamer and Greisamer*, 276 Or 397, 401-02, 555 P2d 28 (1976) (italics added); *see also Henrickson*, 225 Or at 402 ("The net effect of our earlier decisions is to render every prior custody order *res judicata* in any later modification matter." (Italics added.)).

Under such *res judicata* principles, a purportedly changed circumstance cannot be a circumstance that the court contemplated at the time of the earlier determination. *See Padbury and Padbury*, 46 Or App 533, 536, 612 P2d 321 (1980) (stating that change in circumstances "must be a change which was not contemplated at the time of the original decree" and the child's increased age was not such a change); *Wyatt and Wyatt*, 36 Or App 563, 566 n 1, 585 P2d 31, *rev den*, 284 Or 521 (1978) (noting that the mother's graduation from school and new employment "would not be a sufficient change of circumstances standing alone as it would

have been reasonably contemplated at the time the decree was entered"). That rule also applies when a parent fails to raise a known circumstance in an earlier custody proceeding. In *Southworth and Southworth*, 113 Or App 607, 835 P2d 122, *rev den*, 314 Or 574 (1992), we did not consider the mother's nudist lifestyle to be a change in circumstances. Although the court was unaware of that lifestyle at the time of the initial judgment, the father and his attorney knew and failed to raise the matter before the judgment was signed and entered. We explained, "If father thought that the evidence was relevant to mother's capacity to care for their child, he should have brought it to the court's attention, instead of reserving it for use in relitigating the issue of custody." *Id.* at 614.

In recent cases, we have referred to whether a change was "unanticipated" when we discussed the evidence that was or should have been before the court at the time of the earlier custody determination. In *Teel-King and King*, 149 Or App 426, 944 P2d 323 (1997), *rev den*, 327 Or 82 (1998), the father sought to change custody after the mother moved and the child started kindergarten. Citing *Johnson*, *Greisamer*, and *Henrickson*, we stated, "The events constituting the change of circumstances must be unanticipated and must have arisen since the last order was entered." *Teel-King*, 149 Or App at 429-30. We explained that the visitation change caused by the child's enrollment in kindergarten "was contemplated at the time of the judgment. Consequently, we do not consider it in determining whether there has been a change of circumstances." *Id.* at 430 (citing *Southworth*). Similarly, in *Dillard and Dillard*, 179 Or App 24, 32, 39 P3d 230, *rev den*, 334 Or 491 (2002) (citing *Teel-King*), we stated, "Normal developmental changes * * * are factors that are not unanticipated changes. In other words, they should be within the contemplation of a court when it makes an initial custody determination and so cannot, in themselves, provide the basis for a change in circumstances." *See also Hamilton-Waller and Waller*, 202 Or App 498, 510, 123 P3d 310 (2005) (the mother's planned move to Holland would cause interference with father's parenting capacity sufficient to constitute "a substantial unanticipated change of circumstances"; at the time of the dissolution hearing, the mother had indicated

that she did not intend to move the children); *Colson and Peil*, 183 Or App 12, 22, 51 P3d 607 (2002) (the mother's career plans were not a changed circumstance when her plans had not changed in the eight months since the dissolution trial and "were not in any sense unanticipated").

Here, the trial court apparently concluded that, because mother's personality disorder was, by definition, of longstanding duration and therefore not a new circumstance, and because the disorder's effect on child was the result of child's normal development, there had been no change of circumstances that could justify custody modification. We appreciate the trial court's thoughtful consideration of the record, but disagree with that conclusion.

Mother contends that the psychological evaluation and diagnosis of personality disorder do not demonstrate that there has been any change in her ability to care for child. She contends that the psychological assessments do not show "that any mental health problems that mother *might* currently have were of recent origin or that they have resulted in a change in the way that mother parents [child]." (Emphasis in original.) She compares the circumstances in this case to those in *Dillard*. There, a therapist who conducted a custody evaluation testified that the children whose custody was at issue—two boys who were ages six and nine at the time of the modification trial—had an increased need for their father as a result of changes in their age and level of development. The therapist explained (similarly to Davis's testimony in this case regarding the need of younger children for their mothers) that "accepted psychological authority" indicates that children need more time with the same-gender parent when they reach the age of eight to ten. *Dillard*, 179 Or App at 28. We rejected the idea that such changes justified a change in custody, because "[n]ormal developmental changes * * * should be within the contemplation of a court when it makes an initial custody determination and so cannot, in themselves, provide the basis for a change in circumstances." *Id.* at 32 (citation omitted).

Here, unlike in *Dillard*, we are not dealing simply with normal developmental changes. Because of mother's personality disorder, her ability to provide care for child is

decreasing as child grows older. As Ross-Bakker explained, mother was well able to meet child's needs when he was younger; however, now, as child grows older and becomes more occupied with personality development, mother is less able to meet his needs. Furthermore, the risk to child from mother's personality disorder is increasing as child's emotional needs grow more complex.

Mother also contends that, if she has a personality disorder, that disorder must have been present at the time of the earlier custody determination. We consider whether the present effect of mother's personality disorder is a circumstance that was or should have been considered in the earlier custody proceeding. Mother's personality disorder had not been diagnosed at the time of the first judgment. There is no indication that any evidence was or could have been introduced on the issue or that anyone contemplated at the time that mother later would pose a significant risk to child as a result of his developmental changes. Rather, the record shows that, although father had never been impressed by mother's parenting ability, mother was well able to meet child's needs when child was younger. This case, therefore, is unlike *Southworth*, where the father failed to bring evidence to the court's attention in the earlier custody proceeding, "reserving it for use in relitigating the issue of custody." 113 Or App at 614. The present effects on child of mother's personality disorder constitute a new circumstance that was not before the court at the time of the earlier custody determination. We therefore conclude that there has been, since the earlier determination, a change in mother's ability to care for child.

Furthermore, the record shows that child is beginning to suffer significant harm and is at serious risk of further harm as a result of mother's personality disorder. Ross-Bakker testified that it is more likely than not that, if child continues in mother's custody, he will develop a personality disorder. The harm to child in mother's custody and the abundant evidence that child will thrive in father's care fulfill the additional requirement that it is in child's best interest that custody be awarded to father.

Reversed and remanded for entry of judgment granting legal and physical custody of child to father and for development of plan giving mother reasonable parenting time.